1    **WO**                                                                    **NN**

2

3                    IN THE UNITED STATES DISTRICT COURT

4                        FOR THE DISTRICT OF ARIZONA

5

6    Dora Dean Mike, Deceased,            )    No. CV 06-0866-PCT-EHC
     by Larry Mike,                       )
7                                         )    **ORDER**
                     Plaintiff,           )
8                                         )
     v.                                   )
9                                         )
     Office of Navajo and Hopi Indian)
10   Relocation, an administrative agency of)
     the United States,                   )
11                                        )
                     Defendant.           )
12   _____

13

14                            **INTRODUCTION**

15         Before the Court are two Cross Motions for Summary Judgment. (Dkts. 15, 24).

16   Plaintiff seeks relief from a denial of relocation assistance benefits by the Office of Navajo

17   and Hopi Indian Relocation ("ONHIR"), an administrative agency of the United States. The

18   Commissioner of the ONHIR seeks affirmation of its final decision.

19                          **STANDARD OF REVIEW**

20         A court should grant summary judgment when there is no genuine issue of material

21   fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

22   Under the Administrative Procedure Act (APA), "a court reviews the challenged agency

23   action under a narrow and deferential standard to determine whether such action was

24   arbitrary and capricious." Bark v. U.S. Forest Service, No. CV 04-356 MO, 2007 WL

25   756746 (D.Or. Mar. 3, 2007) (citing 5 U.S.C. § 706(2)(A)). A reviewing court may set aside

26   agency action that is unsupported by substantial evidence, is arbitrary, capricious or contrary

27   to law. 5 U.S.C. § 706(2)(A), 2(E). See Bedoni v. Navajo-Hopi Indian Relocation

28   Commission, 878 F.2d 1119, 1122 (9th Cir. 1989). Substantial evidence means "such

1  relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

2  Information Providers' Coalition for Defense of the First Amendment v. FCC, 928 F.2d 866,

3  870 (9th Cir. 1991).  When reviewing an agency's decision under an arbitrary and capricious

4  standard, the Court must determine whether the agency's decision was based on

5  consideration of relevant factors and whether there has been a clear error of judgment.

6  Northwest Motorcycle Association v. U.S. Department of Agriculture, 18 F.2d 1468, 1471

7  (9th Cir. 1994).

8  **PROCEDURAL HISTORY**

9  The ONHIR was created by Congress to carry out the relocation of members of the

10  Navajo and Hopi Tribes who live in the Federal Joint Use Area ("FJUA"), disputed land that

11  was eventually partitioned for each tribe. (Dkt. 1, Complaint for Judicial Review

12  ("Complaint") ¶ 4; Dkt. 10, Answer ¶ 4). The ONHIR was also designated to provide

13  relocation assistance benefits for all households who moved off of land designated to the

14  other tribe pursuant to the Navajo-Hopi Settlement Act ("the Act"). (Complaint ¶ 4; Answer

15  ¶ 4).  Plaintiff Dora Dean Mike ("Dora") was an enrolled member of the Navajo Nation and

16  resided on the FJUA. (Complaint ¶ 3; Answer ¶ 3).

17  One of the Act's regulations provided for relocation assistance benefits to those who

18  were residents of the FJUA "but moved from there between December 22, 1974, and August

19  30, 1978." C.F.R. § 700.147(a)(2) (1983).  The regulation was in effect from March 9, 1979,

20  to June 28, 1984, the period during which applicants could file for benefits. (Complaint, Ex.

21  1).

22  Dora applied for relocation assistance benefits on March 6, 1980. (Dkt. 26,

23  Defendant's Statement of Facts ("DSOF") ¶ 1; Dkt. 29, Plaintiff's Reply to Defendant's

24  Statement of Facts ("PRSOF") ¶ 1).  She was denied benefits on March 12, 1985, because

25  she did not respond to the ONHIR's four requests for additional supporting documents.

26  (DSOF ¶¶ 2-3; PRSOF ¶¶ 2-3).

27  Dora died of cancer on July 22, 1987. (DSOF ¶ 4; PRSOF ¶ 4).

28

1          On June 5, 1990, the ONHIR determined that Dora was eligible to submit an appeal

2    of the denial, and on June 27, 1996, Plaintiff's counsel and the ONHIR stipulated that

3    Plaintiff's husband, Larry Mike ("Larry"), could pursue the appeal on Dora's behalf. (DSOF

4    ¶¶ 5, 7; PRSOF ¶¶ 5, 7).  Plaintiff's appeal was heard on September 21, 1999. (DSOF ¶ 8;

5    PRSOF ¶ 8).

6          The decision of denial was issued on November 17, 1999. (DSOF ¶ 36; PRSOF ¶ 36).

7    The Hearing Officer found that Dora had moved from the FJUA before the Act was passed

8    on December 22, 1974; thus, she did not "move pursuant to the Act." The issue before the

9    Court is whether the Hearing Officer's decision was arbitrary, unsupported by substantial

10   evidence, or contrary to law, and as a result, a clear error of judgment.

11                                        **BACKGROUND**

12         Dora and Larry started dating in high school, a boarding school in Wingate, New

13   Mexico. (DSOF ¶¶ 10-11; PRSOF ¶¶ 10-11).  Dora's family lived in Jeddito, Arizona, and

14   Larry's family lived in Rock Springs, New Mexico. (DSOF ¶ 12; PRSOF ¶ 12).  When Larry

15   graduated in 1972, he went to a California school for automotive training and Dora remained

16   in New Mexico to finish high school. (DSOF ¶ 14, 16; PRSOF ¶ 14, 16).

17         Dora graduated from high school in 1973, began working at a hardware store in

18   Gallup, New Mexico, and obtained a New Mexico driver's license. (DSOF ¶¶ 16-17; PRSOF

19   ¶¶ 16-17).  In July of 1973, Dora and Larry married in her Arizona hometown of Jeddito and

20   obtained a Marriage License and Certificate from the Navajo Nation. (DSOF ¶¶ 18, 21;

21   PRSOF ¶¶ 18, 21).

22         Larry had planned to build a home in Jeddito, Dora's parents' ancestral home, in

23   accordance with Navajo tradition. (PSOF ¶ 17).  Dora's parents owned a two-room frame

24   house, sheep and horse corrals, a ramada and a hogan in Jeddito. (PSOF ¶ 21).  Dora owned

25   two of the horses personally. (PSOF ¶ 13).

26         Larry and his mother, Nellie Mike ("Nellie"), testified that at the traditional,

27   matrimonial ceremony, the family elders advised the couple that, although it was tradition

28

                                              - 3 -

1   to establish themselves in Jeddito, they would have to live elsewhere because the land dispute

2   with the Hopis prevented new construction. (DSOF ¶ 19; PRSOF ¶ 19).

3       Two weeks after the wedding, Dora and Larry moved in with Larry's mother in Rock

4   Springs; Dora left one of her horses in Jeddito and took the other to Rock Springs.  The

5   couple and Nelli lived together in Nellie's home for approximately one year. (DSOF ¶¶ 20,

6   27; PRSOF ¶¶ 20, 27).  After that, in 1974, Nellie moved to Gallup; Dora and Larry

7   continued to live in Nellie's home in Rock Springs..

8       Nellie passed ownership of her house to Larry, and a point of contention between the

9   parties is when that occurred.  According to the ONHIR, Nellie told her son, *before* she

10  moved to Gallup, that he could remodel the Rock Springs home and remain there; this would

11  signify that Larry and Dora inherited the home before December 22, 1974. (DSOF ¶ 27).

12  Both Larry and Nellie testified that she expressed this to her son *after* she had moved to

13  Gallup, but before she returned to Rock Springs in 1978, signifying the liklihood that Larry

14  inherited the home after December 22, 1974. (PRSOF ¶ 27).  Larry remodeled the Rock

15  Springs home for his family in 1978. (PSOF ¶ 24).

16      Larry further testified that he and Dora returned to Jeddito almost every weekend and

17  on vacations. (DSOF ¶ 26; PRSOF ¶ 26).  They viewed their stay in Rock Springs as a

18  temporary employment arrangement; Dora always wanted to return to Jeddito permanently.

19  (PSOF ¶ 19).  After five years of waiting for the land dispute to be resolved so they could

20  build their own home in Jeddito, Dora and Larry decided to make Rock Springs their

21  permanent home in June 1978. (PSOF ¶ 23).  Consequently, Dora, a member of the Navajo

22  Nation Jeddito Chapter, changed her voter registration to the Rock Springs Chapter on July

23  10, 1978. (PSOF ¶ 23).  Defendant argues that the couple made Rock Springs their

24  permanent residence after the wedding in 1973. (Dkt. 25, p.2).

25      Larry finished remodeling the Rock Springs home around 1978, and he and Dora lived

26  there from 1973 until 1986, when Dora became ill. (DSOF ¶¶ 28, 30; PRSOF ¶¶ 28, 30).

27  During that time, they filed taxes, did their banking, and worked in Gallup. (DSOF ¶¶ 25, 29,

28  31-32; PRSOF ¶¶ 25, 29, 31-32).  Both of their children were born in Gallup, and the older

1  child, Vincent, testified that he grew up and attended school in Gallup. (DSOF ¶¶ 33-34;

2  PRSOF ¶¶ 33-34).  Vincent did, however, return to Jeddito with his parents on weekends,

3  and also spent every summer there throughout elementary school. (PSOF ¶ 25).

4       When Dora was diagnosed with cancer in 1986, she moved back to Jeddito where she

5  died a year later. (PSOF ¶ 26).

6  **DISCUSSION**

7       To qualify for relocation assistance benefits, the applicant must meet three

8  requirements: *1)* the application must have been filed between March 9, 1979 and June 28,

9  1984; *2)* the applicant must have been a resident of the area partitioned to the tribe of which

10  she was not a member, a resident of the FJUA but from where she had moved away between

11  December 22, 1974, and August 30, 1978, or a resident of an area partitioned to the tribe of

12  which she was not a member but from where she moved away after August 30, 1978; and *3)*

13  the applicant is a head of household. (Dkt. 13, p. 3).

14       There is no dispute that Dora met the first and third requirements.  There is also no

15  disagreement that Dora was a resident of the FJUA.  The sole issue is whether she moved

16  away from the FJUA between December 22, 1974, and August 30, 1978.  The ONHIR argues

17  that Dora moved from the FJUA in 1973; Plaintiff asserts that Dora established legal

18  residency in July of 1978.

19  **I.  Hearing Officer's Findings of Fact**

20       The Hearing Officer for the ONHIR affirmed the denial of benefits finding that:

21       A.    Dora spent Thanksgiving and Christmas of 1972 in Rock Springs.

22       B.    Larry intended to work in Gallup after finishing his training in California.

23       C.    Dora moved to Rock Springs almost immediately after high school graduation, and held several jobs in Gallup between 1973 and 1986.

24

     D.    After their Jeddito wedding, the couple spent only one night in Jeddito.

25

     E.    Nellie eventually gave her Rock Springs home to the couple, which Larry
26            remodeled.

27       F.    Dora and Larry periodically returned to Jeddito on a weekend.

28       G.    The couple both had New Mexico driver's licenses and bank accounts.

H.      There was no evidence that Larry ever built a traditional marital home for Dora in Rock Springs or anywhere else.

(DSOF ¶ 38).  As a preliminary matter, the Court finds that reasons A and D are irrelevant to the issue before the Court.

A voter registration card was introduced at the hearing as evidence that Dora officially moved to Rock Springs when she registered to vote there on July 10, 1978.  However, although it was signed by a Registration Officer, Dora had not signed or dated the document. Consequently, the Hearing Officer rejected the card and did not make it a part of the record. (DSOF ¶ 35; PRSOF ¶ 35).

## II.  Hearing Officer's Conclusions of Law

The Hearing Officer concluded that:

A.      As of December 22, 1974, Dora was not a legal resident of the Jeddito Chapter because she had resided in Rock Springs, New Mexico, since she graduated from high school; here children were born and raised in Rock Springs; she was employed in Gallup, New Mexico; and she visited the Jeddito area primarily for social reasons and assisting her family.

B.      Alternatively, if Dora maintained her legal residency in Jeddito, her move from there was not "pursuant to the Act" since her circumstances did not change except to transfer her voter registration from Jeddito to Rock Springs in 1978.

C.      Dora did not move "pursuant to the Act" before December 22, 1974, because the Act had not yet passed, and such move was for purposes other than in response to the Act.

D.      Therefore, Plaintiff is not entitled to relocation benefits.

(Administrative Record ("AR"), pp. 158-59).

## III.  Legal Residence

The ONHIR published a Plan Update in 1990 which defines residency for the purpose of relocation benefits. (Dkt. 13, pp. 4-6).  It rejected "actual occupancy" as a requirement and instead chose "legal residency" as the operative definition. (Dkt. 13, Ex. 3).  Legal residency is, according to the ONHIR,

> where a person might be temporarily away, but maintained substantial, recurring contact with an identifiable homesite. This interpretation considered the fact that many persons would leave the partitioned lands temporarily to seek employment, job training, or other opportunities.  Yet, they maintained strong ties to their homes and community and *considered themselves* residents.

1 Id. (emphasis added). The agency justified its choice of definition as follows:

2
3
4

[T]he definition of legal residency best met both legal requirements and circumstances of life on the partitioned lands. By reflecting the cultural traditions and economic realities of the people affected by relocation, this interpretation fulfilled the intent of Congress to provide for a thorough and generous program.

5 Id.

6 **1. Employment and the economic realities of life on the reservation**

7 The purposes of education and employment are valid reasons for being "temporarily

8 away" from a legal residence. (Dkt. 13, Ex. 4). The Hearing Officer cites Dora's

9 employment in New Mexico as support for denying the relocation benefits, even though it

10 is a recognized reason for being "temporarily away." Moreover, the Hearing Officer ignores

11 that her high school attendance for four years at a boarding school in New Mexico was

12 presumably a temporary stay given Dora's status as a minor. It is consistent with her

13 continued temporary stay for employment after graduation, because Jeddito offers little in

14 terms of employment and education. (See Dkt. 13, pp. 11-13).

15 The ONHIR itself acknowledges the "economic realities" of those residents who

16 relocate temporarily for school or work. The government does not dispute that facilities such

17 as banks, vehicle registration facilities, schools, and jobs are rarely accessible in Jeddito, a

18 phenomenon still problematic today but more so in 1973. (See Dkt. 13, pp. 12-13).

19 Larry testified that he intended to work in New Mexico after finishing school in

20 California because there was no work for him in Jeddito.

21 **2. Substantial contact and strong ties to the home and community**

22 Dora also maintained substantial, recurring contact with her home in Jeddito, traveling

23 there almost every weekend and whenever she and Larry had time off from work. Larry,

24 Nellie, and Vincent all testified to that fact. Without explanation, the Hearing Officer instead

25 characterized the contact as periodic social visits to Jeddito. (DSOF ¶ 38).

26 Furthermore, according to the testimony, Dora considered herself to be a resident of

27 Jeddito until 1978, which parallels her strong ties and recurring contact with her parents and

28

- 7 -

1 their ancestral home.  This is further evidenced by Dora's decision to move back to Jeddito

2 for her last year of life, before dying of cancer.

3 **3. Property ownership**

4 The parties do not dispute that when Nellie told her son he could have the home, she

5 told him he could remodel the home as well.  He did not do so until approximately 1978,

6 reflecting the likelihood that Nellie conveyed the property to Larry after she moved to

7 Gallup, a point of contention between the parties.  Even if the property were conveyed before

8 1974, many married couples own property outside their location of residence.  While the

9 timing of transfer of Nellie's home to Larry is a factor in determining when Dora established

10 her legal residence in New Mexico, it is not definitive.

11 **4. Cultural Tradition**

12 The ONHIR does not dispute the Navajo tradition that a newly married husband is

13 obligated to build a house at the ancestral homeland of his wife's parents.  The defendant

14 asserts, however, that the couple could not have "reasonably relied" on the advice of elders

15 at their wedding to live elsewhere "pursuant to the Act," because the relocation enactment

16 occurred on December 22, 1974, well after the couple's wedding. (Dkt. 25, p. 2).

17 It is unlikely, however, that the tension between the Navajos and Hopis was not

18 known to the Jeddito residents living in the partitioned lands.  In fact, testimony by nearby

19 residents in another case demonstrates that the land dispute was public knowledge well

20 before the enactment and that some hogans in an area near Jeddito had been burned down by

21 the Hopis. (See Dkt. 30, Ex. 2).  It is fair to assume that the couple's reliance on their elders'

22 advice was reasonable.

23 The couple intended to adhere to tradition and build a home in Jeddito.  They waited

24 five years, but the land dispute persisted and they were unable to do so.  Although the

25 Hearing Officer found that Larry did not build a home for Dora elsewhere, it would not have

26 met Larry's traditional obligation that the home be built in Jeddito.  Nonetheless, Larry

27 substantially remodeled the Rock Springs home in 1978, after it was given to him by his

28 mother.

1    Larry's failure to build a new home elsewhere is immaterial; this finding of fact in

2    support of the Hearing Officer's  adverse decision was inappropriate.

3    **5.  Residential Intent**

4    The ONHIR does not challenge the fact that Dora, Larry, and their two children were

5    listed on the JUA enumeration roster which identifies occupied homesites and residents.  The

6    Mike family members were listed as residents of Jeddito on the roster, which was dated

7    November 13, 1974, one month prior to the passage of the Settlement Act. (Dkt. 13, p. 6).

8    The ONHIR's Management Manual indicates that "[t]he JUA roster is the master

9    record used by the Commission to determine the existence of occupied homesites . . . and to

10   identify residents of these homesites. (Dkt. 13, Ex. 5).  "If the applicant is listed on the JUA

11   roster, he/she is assumed to have been a legal resident unless there is evidence to the

12   contrary." Id.  Despite this presumption, the Hearing Officer does not acknowledge the

13   enumeration roster at all in his decision.

14   Although not admitted as part of the record by the Hearing Officer, Dora's voter

15   registration card was recognized by a Records Clerk at the Navajo Nation Elections Office

16   in Window Rock, Arizona, as a "temporary record." (See Dkt. 13, pp. 7-8).  A Registration

17   Officer had signed and dated the card on July 10, 1978, but Dora had not.  Nevertheless, the

18   Records Clerk indicated that these temporary records never bore the voter's signature but

19   were simply an interim step between an applicant's affidavit and the eventual list of eligible

20   voters. (Dkt. 13, p. 7, note 4).[1]   According to Plaintiff, and not contended otherwise by

21   Defendant, a Jeddito Chapter Coordinator confirmed that "registration with a new Chapter

22   is synonymous with becoming a member there." (Dkt. 13, p. 8, note 5).

23   Larry unequivocally testified that he and Dora intended to return to Jeddito, and were

24   in Rock Springs temporarily for work. (Dkt. 13, p. 12).  Dora considered herself a resident

25

26

27       [1]Although Dora's affidavit could not be located, it is not unusual that such records are
     routinely purged, not only because Dora had died, but because Larry's request for the
28   document was eleven years after her death. (See Dkt. 13, p. 7, note 4).

- 9 -

1  of Jeddito up until the time she transferred her voter registration from Jeddito to Rock

2  Springs in 1978.

3       Dora's voter registration card, her JUA roster listing as a legal resident of Jeddito on

4  November 13, 1974, and testimony of the witnesses, together are strong evidence that she

5  officially moved to Rock Springs when she registered to vote there on July 10, 1978.

6       In summary, Dora met the presumption of legal residency through her listing on the

7  JUA roster in late 1974, a fact the Hearing Officer did not mention in his Decision.  She was

8  "temporarily away" from her homesite before her marriage for school.  Moreover, Larry

9  testified she was "temporarily away" after their marriage for work, *and* because the couple

10  could not build a new home in Jeddito due to a construction freeze.

11       While the couple waited for a resolution to the land dispute, Dora maintained

12  substantial ties and recurring contact with an identifiable homesite, her parents' home in

13  Jeddito.  The Hearing Officer did not explain why he characterized it as periodic interaction,

14  instead. When the couple decided to reside permanently in Rock Springs, Dora transferred

15  her voter registration accordingly.

16  **IV.  Credibility of Witnesses**

17       The Hearing Officer found that the three witnesses, Larry, Nellie, and Vincent, were

18  credible witnesses. (AR, pp. 159-60).  Yet, he chose to disregard the relevant testimony with

19  regard to Dora's intent to live in Rock Springs temporarily until she and Larry could build

20  their own home in Jeddito.  Furthermore, the Officer failed to explain why he found the

21  witnesses credible in some respects but not in others.  In considering all of the witness'

22  testimony as credible, there is no alternative but to conclude that Dora met the criteria for

23  legal residency on the FJUA.

24  **V.  Fiduciary Relationship between the U.S. government and Native Americans**

25       "The United States Supreme Court has repeatedly recognized 'the distinctive

26  obligation of trust incumbent upon the Government in its dealings with [Native Americans]."

27  Bedoni v. Navajo-Hopi Indian Relocation Comm'n, 878 F.2d 1119, 1124 (9th Cir. 1989)

28  (quoting Seminole Nation v. United States, 316, U.S. 286, 296 (1942)) (alteration in original)

- 10 -

1  (citations omitted).  This obligation is reflected in the ONHIR's own Plan Update that it is

2  "the intent of Congress to provide for a thorough and generous [relocation benefit] program."

3  (Dkt. 13, Ex. 3).

4  **VI.  Conclusion**

5  The Hearing Officer does not justify findings which contradict testimony that he

6  characterizes as credible.  Nor does he explain why he ignores credible evidence, in

7  particular, the JUA roster which names Dora as a resident of Jeddito in November of 1974.

8  His decision is arbitrary, capricious, and unsupported by substantial evidence.  It is a clear

9  error of judgment.

10  There are no genuine issues of material fact.  The sole contested fact, the timing of

11  Nellie's transfer of her home to Larry, is not material.  Regardless of when the conveyance

12  occurred, a finding, that Plaintiff is entitled to relocation benefits, is clearly demonstrated.

13  Accordingly,

14  **IT IS ORDERED** that Plaintiff's Motion for Summary Judgment (Dkts. 13, 15) is

15  **granted**.

16  **IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Dkt.

17  24) is **denied**.

18  **IT IS FURTHER ORDERED** remanding the matter for payment of benefits to

19  Plaintiff.

20

21  DATED this 2nd day of January, 2008.

22

23

24  _____

25  Earl H. Carroll
United States District Judge

26

27

28

- 11 -